JOHNSON FAMILY LIMITED PARTNERSHIP v
WHITE PINE WIRELESS, LLC

Docket Nos. 278258 and 278695. Submitted October 14, 2008, at Grand
Rapids. Decided October 30, 2008, at 9:00 a.m.

The Johnson Family Limited Partnership brought an action in the
Grand Traverse Circuit Court against White Pine Wireless, LLC,
and J.P.M.S., Inc. (JPMS), seeking reformation of a deed to a parcel
of land that the plaintiff sold to JPMS so that restrictions that
were contained in the purchase agreement are included in the
deed. The plaintiff further sought a declaration that the restric-
tions apply to White Pine, who leased the property from JPMS,
and that the construction of a cell tower and fencing on the
property violate the restrictions at issue. The plaintiff and White
Pine each moved for summary disposition. The court, Philip E.
Rodgers, Jr., J., granted the plaintiff's motion, ruling that the
plaintiff was entitled to reformation of the deed, that the doctrine
of merger did not bar such reformation, that White Pine was not
a bona fide purchaser, and that the cell tower constituted a "utility
conduit" prohibited by the restrictions. The court entered a
judgment reforming the deed to include the restrictions, enjoining
the construction of a cell tower and a fence, and ordering that the
cell tower and the fence, which by that time had been constructed,
be removed. White Pine and JPMS appealed separately. The
appeals were consolidated.

The Court of Appeals *held*:

1. The general rule is that courts will follow the plain language
of a deed in which there is no ambiguity. However, the equitable
power to reform a deed may be applied to an unambiguous deed
where the deed fails to express the obvious intention of the parties.
Therefore, the trial court could properly reform the unambiguous
deed if the plaintiff established the necessary grounds for such
equitable relief. The plaintiff did meet this burden in this case.

2. The equitable power to reform a deed is an exception to the
application of the merger doctrine, which provides that a deed
made in full execution of a contract for the sale of land is presumed
to merge the provisions of a preceding contract pursuant to which
it is made, including all prior negotiations and agreements leading

up to the execution of the deed. The trial court could therefore properly consider the parties' prior negotiations and the purchase agreement in determining whether the deed accurately reflected the intent of the parties.

3. A deed may be reformed on the basis of mutual mistake and, under certain circumstances, on the basis of a unilateral mistake. The evidence in this case established a mutual mistake of law. The plaintiff and JPMS specifically intended the deed to contain the restrictions. Because the restrictions were omitted from the deed, the deed did not have the legal effect intended by the parties. The trial court properly determined that the deed did not reflect the actual intent of either party and should be reformed because of a mutual mistake.

4. Even if the mistake were a unilateral mistake by the plaintiff, reformation of the deed would still be warranted because the undisputed evidence supports an inference that JPMS knew that the plaintiff intended the deed to contain the restrictions, recognized that the restrictions had been omitted, and remained silent about the mistake.

5. The trial court did not err in determining that the plaintiff had not received a request for admissions by White Pine and, therefore, the requested admissions need not be deemed as having been made by the plaintiff.

6. There was no evidence presented that the cell tower contained "wires or conduits" in violation of the restrictions. The trial court prematurely determined that the cell tower violated the restrictions. The part of the order enjoining construction of the cell tower and ordering the removal on that basis must be reversed and the case must be remanded for a hearing regarding this issue. If the trial court determines that the cell tower does not constitute prohibited wires or conduits, then the court must determine if the cell tower constitutes an "unnatural improvement" in violation of the restrictions.

7. The trial court properly determined that the fence violated the restrictions and properly ordered its removal and enjoined the erection of any fencing.

8. White Pine only had an option to lease and, before it exercised that option, received actual notice regarding the restrictions. White Pine was not a purchaser in good faith without notice of a defect in the title.

9. The plaintiff acted as soon as practicable when learning that the deed did not contain the restrictions. The doctrine of laches does not bar reformation of the deed.

.

Affirmed in part, reversed in part, and remanded.

1. DEEDS — EQUITY — REFORMATION OF DEEDS.

> The equitable power to reform a deed may be applied to an unambiguous deed where the deed fails to express the obvious intention of the parties.

2. DEEDS — MERGER DOCTRINE — EQUITY — REFORMATION OF DEEDS.

> The equitable power to reform a deed is an exception to the doctrine of merger and allows the court to consider the parties prior negotiations and agreements in determining whether the parties' allegedly inaccurate deed reflects the intent of the parties.

3. DEEDS — MUTUAL MISTAKE — UNILATERAL MISTAKE — REFORMATION OF DEEDS.

> A deed may be reformed on the basis of mutual mistake and, under certain circumstances, on the basis of a unilateral mistake.

4. VENDOR AND PURCHASER — OPTIONS TO LEASE — GOOD-FAITH PURCHASERS.

> An option to lease does not transfer an interest in land until the option is exercised; a person who discovers that there are restrictions applicable to land after receiving an option to lease the land but before exercising the option is not, after exercising the option, a purchaser in good faith without notice of the restrictions.

*Mark A. Hullman* for the plaintiff.

*Bishop & Heintz, P.C.* (by *Steven R. Fox* and *Douglas S. Bishop*), for White Pine Wireless, LLC.

*Tom H. Evashevski* for J.P.M.S., Inc.

Before: O'CONNELL, P.J., and BANDSTRA and GLEICHER, JJ.

BANDSTRA, J. In this suit to reform a deed and enforce restrictions, defendants J.P.M.S., Inc. (JPMS), and White Pine Wireless, LLC (White Pine), appeal as of right the trial court's grant of summary disposition in favor of plaintiff, Johnson Family Limited Partnership (the Partnership). On appeal, the primary issues are

whether the trial court could properly reform an unambiguous deed to include omitted deed restrictions notwithstanding the doctrine of merger, whether the facts supported reformation of the deed at issue on the basis of mutual or unilateral mistake, and, if the trial court properly reformed the deed, whether White Pine's construction of a cell tower violated the restrictions. We conclude that the trial court properly reformed the deed to include the omitted restrictions, but that there was insufficient record evidence to support the conclusion that the cell tower constitutes wires or conduits within the meaning of the restrictions. For that reason, we affirm in part, reverse in part, and remand for further proceedings.

### I. BASIC FACTS AND PROCEDURAL HISTORY

In approximately 2000, JPMS began negotiations to purchase a parcel of real property owned by the Partnership. At the time, the Johnson Family Trust (the Trust) served as the general partner for the Partnership. In September 2000, the Trust entered into a purchase agreement to sell the property to JPMS. The Trust did not indicate whether it was signing on behalf of the Partnership.

The agreement provided that "[t]he Deed to be executed in conveyance of the Subject property shall contain" certain specified building and use restrictions that would be applicable "until Seller shall cease to own the property commonly known as Acme Village." Among the restrictions were the following:

(j) No exterior lighting shall be installed on the property, which shall shine upon the street or any adjoining property without the approval of the Seller or his successor. No power, telephone or other utility wires or conduits shall be

installed above ground on the property other than the currently existing power lines.

(k) No statue, fence or other unnatural improvements shall be permitted on the Property without the approval of his [sic] Seller or successor.

Corporate Title Agency handled the closing, which occurred on December 13, 2000, with neither party in attendance. Jerome Jelinek, who is the president of Corporate Title Agency and an attorney, prepared the warranty deed for the closing. However, Jelinek did not include the restrictions on the deed. The warranty deed was recorded on December 29, 2000. After the closing, a hotel was built on the property. JPMS later leased the hotel to American Hospitality Management, which operates a Holiday Inn Express at the site.

On February 28, 2006, JPMS granted an option to lease a portion of the property at issue to White Pine. The option had a term of one year and could be exercised by paying $550 to JPMS. In March 2006, White Pine applied for a special use permit to construct a cell tower on the property. As a result of this application, the Partnership became aware of White Pine's plan to build a cell tower on the property the Partnership sold to JPMS. Shortly thereafter, the Partnership also learned its deed to JPMS did not contain the restrictions described in the purchase agreement. After the Partnership contacted the title company about the discrepancy in the deed, Jelinek prepared an affidavit listing the restrictions and indicating that the restrictions had been omitted from the deed. He also indicated that the affidavit was intended to correct the warranty deed to reflect the parties' intent. The affidavit was recorded on June 28, 2006.

In July 2006, the Partnership contacted the township regarding its belief that the land in question was subject

to restrictions. After the township forwarded the Partnership's letter to White Pine, White Pine acknowledged the claims in a letter to the township dated July 21, 2006. On August 1, 2006, the township approved the special use permit.

On September 6, 2006, the Partnership sued White Pine for declaratory and injunctive relief. On December 7, 2006, the Partnership amended its complaint to join JPMS. In the amended complaint, the Partnership asked the trial court to reform the deed so that a mutual mistake regarding the non-inclusion of the restrictions listed in the purchase agreement could be corrected, to declare that the restrictions properly apply to White Pine because White Pine had notice of the claimed restrictions before it exercised its option to lease, and to enjoin the construction of the cell tower.

On October 23, 2006, White Pine assigned its option to lease to SBA Towers, Inc. And, by December 13, 2006, SBA completed the construction of the cell tower and a fence around it.

On February 12, 2007, White Pine moved for summary disposition. White Pine argued that the restrictions did not apply to the property because they were not part of the recorded deed, which must be enforced as written, and that consideration of any previous negotiations or agreements was barred under the doctrine of merger. It further argued that JPMS never intended to create deed restrictions on the property. It also contended that it was a bona fide purchaser for value and, therefore, not bound by unrecorded deed restrictions. White Pine also argued that, even if the deed restrictions were to apply, the cell tower did not violate any of the deed restrictions. Finally, White Pine argued that it would be inequitable for the trial court to enforce the deed restrictions against it under the circumstances.

On March 8, 2007, the Partnership also moved for summary disposition. It argued that there was no dispute that the parties had intended the restrictions to apply to the property and that the deed did not reflect that intent. Thus, the Partnership contended, it was entitled to a reformation of the deed to include the restrictions. The Partnership also argued that White Pine did not obtain an interest in the property until after White Pine exercised the lease option. Because White Pine had notice of the claimed restrictions by the time it exercised the lease option, the Partnership further argued that White Pine could not avoid application of the restrictions as a bona fide purchaser for value. On the basis of these arguments, the Partnership asked the trial court to grant the requested relief.

On March 16, 2007, JPMS responded to the Partnership's motion for summary disposition. JPMS argued that the omission of the restrictions was not the result of mutual mistake. JPMS supported this contention with an affidavit by the president of JPMS, Donald R. Schappacher. In the affidavit, Schappacher stated that his attorneys had expressed concerns over the restrictions contained in the purchase agreement, which, they indicated, should be resolved before closing. Schappacher further averred that JPMS's attorneys were delegated the task of reviewing the deed and, when the deed arrived with no restrictions, the attorneys approved the deed with the understanding that the deed was not subject to the restrictions. JPMS also agued that the doctrine of laches applied to the facts of the case and should preclude equitable relief. For these reasons, JPMS asked the trial court to deny the Partnership's motion and grant summary disposition in JPMS's favor under MCR 2.116(I)(2).

On May 7, 2007, the trial court issued its opinion and order. The trial court concluded that the Partnership was

entitled to reformation of the deed to include the restrictions under the undisputed facts of the case. The trial court also rejected the contentions that the merger doctrine barred reformation and that White Pine was a bona fide purchaser. Finally, the trial court concluded that the cell tower constituted a utility conduit and, therefore, violated the use restrictions. For these reasons, the trial court granted the Partnership's motion for summary disposition and denied White Pine's motion for summary disposition. On May 31, 2007, the trial court entered a judgment reforming the deed to include the restrictions, enjoining the construction of a cell tower and fence, and ordering the removal of the existing cell tower and fence.

White Pine and JPMS appealed separately. The appeals were consolidated.

## II. THE EQUITABLE POWER TO REFORM A DEED

White Pine first argues that the deed at issue was not ambiguous and did not contain any restrictions. Therefore, the trial court did not have the authority to reform it to include restrictions and should have enforced the deed as written.

### A. STANDARD OF REVIEW

This Court reviews de novo decisions on motions for summary disposition. *State Farm Fire & Cas Co v Corby Energy Services, Inc*, 271 Mich App 480, 482; 722 NW2d 906 (2006). Whether a grant of equitable relief is proper under a given set of facts is a question of law that this Court also reviews de novo. *McDonald v Farm Bureau Ins Co*, 480 Mich 191, 197; 747 NW2d 811 (2008).

### B. THE POWER TO REFORM AN UNAMBIGUOUS DEED

Michigan courts sitting in equity have long had the

power to reform an instrument that does not express the true intent of the parties as a result of fraud, mistake, accident, or surprise. See *Scott v Grow*, 301 Mich 226, 238-239; 3 NW2d 254 (1942); see also *Potter v Chamberlin*, 344 Mich 399, 407; 73 NW2d 844 (1955) (noting that the "power of a court of equity to grant relief by way of reformation of a conveyance of property, or other instrument in writing, on the ground of mutual mistake is not open to question"). And our Supreme Court has never limited the equitable power to reform an instrument to only those cases involving ambiguous deeds. Indeed, our Supreme Court has specifically held that the equitable power to reform may be applied to unambiguous agreements. See *Urick v Burge*, 350 Mich 165; 86 NW2d 543 (1957).

In *Urick*, the plaintiff sued for specific performance of an option to purchase land that the plaintiff had leased from the defendant. *Id.* at 166. The defendant presented evidence that, despite the language actually used in the lease, the parties had intended to provide the plaintiff with a first opportunity to purchase the property at the end of the 10-year lease, should the defendant wish to sell it. *Id.* at 167-168. On the basis of the parties' testimony, the trial court concluded that the parties intended the option—whether an absolute option or one subject to the defendant's decision to sell—to be exercised at the end of the 10-year lease. *Id.* at 168. For that reason, the trial court concluded that the plaintiff's suit filed before the end of the lease was premature and dismissed it. *Id.* The plaintiff then appealed to our Supreme Court.

On appeal, the plaintiff contended that the trial court erred in "making a contract for the parties contrary to the clear and definite terms of the lease," *id.* at 166, especially considering that both parties had read it, *id.* at 174. But our Supreme Court rejected the notion that the

lease had to be enforced as written on that basis: "If reading a written instrument (which both parties thereto admit did not express their intention) precludes reformation thereof on the ground of mutual mistake, then we wipe out hundreds of years of equity and elevate the scrivener to the ermine." *Id.* The Court acknowledged that a strictly formal system of law " ' "knows no contrast between the will and the utterance, and no possibility of a contradiction between the two," ' " *id.* (citations omitted), but rejected this system as "primitive":

> We do not dispute the seductive simplicities of this doctrine. At one stroke we remove from the law all the vexing and confounding questions about what goes on in the mind of man. Who cares? There stands the scroll.
>
> But it has never been doubted, from the very beginnings of what we know as equity, that the chancellor does indeed concern himself with the intent of people. Specifically, as to the situation confronting us, that he will amend an instrument to represent the actual agreement of the parties, *regardless of the content of the parchment. [Id.* at 174-175 (emphasis added).]

Hence, the "general rule is that courts will follow the plain language in a deed in which there is no ambiguity." *Farabaugh v Rhode,* 305 Mich 234, 240; 9 NW2d 562 (1943). But if "the deeds fail to express the obvious intention of the parties, the courts will try to arrive at the intention of the parties . . . ." *Id.* Consequently, the trial court could properly reform the deed at issue—even though it was not ambiguous—if the Partnership established the necessary grounds for relief.

### III. THE JELINEK AFFIDAVIT

White Pine next contends that, because Jelinek's affidavit was improperly recorded, the trial court could not properly consider it when determining whether to

grant summary disposition. However, even if we were to conclude that the affidavit was not properly recorded, see MCL 565.451a, White Pine failed to cite any authority for the proposition that a trial court may not consider an improperly recorded affidavit in deciding a motion for summary disposition. Furthermore, White Pine did not state how this error prejudiced it in the trial court. Because this issue was not properly briefed on appeal, White Pine has abandoned any claim of error in that regard. See *Hamade v Sunoco, Inc (R&M)*, 271 Mich App 145, 173; 721 NW2d 233 (2006).

#### IV. THE MERGER DOCTRINE AND THE POWER TO REFORM A DEED

On appeal, both White Pine and JPMS argue that the prior negotiations and the purchase agreement were merged into the deed. Because the prior negotiations and agreement were merged into the deed, they further contend, the trial court erred when it reformed the deed on the basis of the prior negotiations and agreement between the parties.

##### A. STANDARD OF REVIEW

Whether the merger doctrine applied to preclude the trial court from considering the parties' prior negotiations and agreement is a question of law. See *Goodspeed v Nichols*, 231 Mich 308, 315-316; 204 NW 122 (1925); *Greenspan v Rehberg*, 56 Mich App 310, 320; 224 NW2d 67 (1974). This Court reviews questions of law de novo. *Gen Motors Corp v Dep't of Treasury*, 466 Mich 231, 236; 644 NW2d 734 (2002).

##### B. THE MERGER DOCTRINE

Under the merger doctrine, "a deed made in full execution of a contract for the sale of land is presumed

to merge the provisions of a preceding contract pursuant to which it is made, including all prior negotiations and agreements leading up to execution of the deed . . . ." *Goodspeed, supra* at 316. But this rule is not absolute. For example, Michigan courts have long recognized that, where delivery of the deed represents only partial performance of the preceding contract, the unperformed portions are not merged into it. *Id.*; see also *Chapdelaine v Sochocki*, 247 Mich App 167, 171; 635 NW2d 339 (2001). Similarly, the equitable power to reform a deed is an exception to application of the merger doctrine. As already noted, Michigan courts have long upheld the equitable power to reform a deed on the basis of a mutual mistake or a unilateral mistake coupled with inequitable conduct or fraud. See *Scott, supra* at 238-239. In most, if not all, cases, the actual intent of the parties to a deed can be discerned only from evidence concerning the prior negotiations and agreements of the parties along with evidence that the deed did not accurately reflect that intent. And our Supreme Court has recognized that, where the proofs warrant it, a court sitting in equity might reform a deed notwithstanding the doctrine of merger. See *Clifton v Jackson Iron Co*, 74 Mich 183; 41 NW 891 (1889), partially overruled on other grounds *Blough v Steffens*, 349 Mich 365 (1957); see also *Parsons v Detroit & M R Co*, 122 Mich 462; 81 NW 343 (1899) (noting that, absent evidence of mistake or fraud, a deed would control over a previous contract).

In *Clifton, supra* at 184, the defendant sold land containing standing timber to the plaintiff. The agreement to sell included a provision reserving to the defendant the right to cut the timber within 10 years of the agreement. *Id.* The defendant then conveyed the land to the plaintiff by a warranty deed that did not contain the reservation. *Id.* at 184-185. Eight years

later, the defendant entered the land and cut the timber, after which the plaintiff sued for trespass. *Id.* at 184. In considering the evidence, our Supreme Court noted that it was within the defendant's power to relinquish the reservation, and, on the basis of the evidence, held that the deed must control over the reservation contained in the agreement to sell. *Id.* at 185. However, the Court also noted: "We do not hold that if the deed were so made by some mistake within the cognizance of equity the mistake might not be corrected." *Id.* The Court explained that it did not need to consider the issue of mistake because there was "no testimony tending to show that the deed was not supposed and intended to close up all the rights of the parties." *Id.*

Furthermore, although no modern Michigan cases have specifically stated that the doctrine of merger does not preclude a court from examining prior negotiations and agreements when exercising its equitable power to reform a deed, in practice courts have done just that. See, e.g., *Potter, supra* at 407-408 (permitting reformation of a deed in part on the basis of evidence concerning prior negotiations and agreements); *Bush v Merriman*, 87 Mich 260; 49 NW 567 (1891) (examining evidence of prior negotiations to conclude that a seller could seek reformation of a deed purporting to grant more land than the parties understood would be the subject of the deal). Likewise, other states' courts have explicitly recognized the equitable power to reform a deed as an exception to the rule that prior negotiations and agreements are merged into a deed. See *Czarobski v Lata*, 227 Ill 2d 364, 371-373; 882 NE2d 536 (2008) (holding that mutual mistake is an exception to application of the merger doctrine and listing jurisdictions that have held the same); *Panos v Olsen & Assoc Constr, Inc*, 2005 Utah App 446, ¶ 14; 123 P3d 816 (2005) (stating that Utah recognizes four exceptions to appli-

cation of the merger doctrine including " 'mutual mistake in the drafting of the final documents' ") (citation omitted); *Providence Square Ass'n, Inc v Biancardi*, 507 So 2d 1366, 1371 (Fla, 1987) (stating that the doctrine of merger "is inapplicable in an action seeking the equitable remedy of reformation"). On the basis of these authorities, we conclude that the merger doctrine does not prevent a court from exercising its equitable power to reform a deed. Therefore, the trial court could properly consider the parties' prior negotiations and agreement when determining whether the deed accurately reflected the intent of the parties.

### V. THE RELEVANCY OF THE PURCHASE AGREEMENT

As part of its argument on merger, White Pine also contends that the purchase agreement was not relevant to establish the intent of the parties because the agreement was not between the Partnership and JPMS. However, White Pine did not raise this argument in the trial court. Our Supreme Court recently reiterated that, in a civil case, the failure to properly raise an issue in the trial court generally constitutes a waiver of that issue on appeal. *Walters v Nadell*, 481 Mich 377, 387-388; 751 NW2d 431 (2008). Although White Pine waived this issue, this Court may overlook the preservation requirements "if the failure to consider the issue would result in manifest injustice, if consideration is necessary for a proper determination of the case, or if the issue involves a question of law and the facts necessary for its resolution have been presented." *Smith v Foerster-Bolser Constr, Inc,* 269 Mich App 424, 427; 711 NW2d 421 (2006).

This issue involves sorting out the relationships between the Trust, the Partnership, and the individual members of the Trust and the Partnership, as well as

the capacities in which these entities acted. The trial court never had the opportunity to sort out these issues. Further, by failing to properly raise this issue in the trial court, White Pine denied the Partnership the opportunity to elicit testimony and present documentary evidence concerning the relationship between these parties. Finally, despite the nature of the relationships, it is clear that JPMS primarily dealt with Lanny L. Johnson, who acted as the agent for the Trust and the Partnership. Hence, by whatever relationship and capacity Johnson may have appeared, JPMS must have negotiated with the understanding that the purchase agreement applied to the transfer of the Partnership land at issue. Consequently, under these facts, we decline to further consider this issue.

### VI. EVIDENCE IN SUPPORT OF MUTUAL OR UNILATERAL MISTAKE

Both White Pine and JPMS argue that there was insufficient evidence to support reformation of the deed on the basis of a mutual or unilateral mistake. For that reason, they further argue, the trial court erred when it granted summary disposition in favor of the Partnership and reformed the deed on the basis of mutual mistake or unilateral mistake.

### A. STANDARD OF REVIEW

This Court reviews de novo whether a trial court properly granted summary disposition. *State Farm Fire & Cas Co, supra* at 482. When reviewing a motion for summary disposition, this Court examines the evidence submitted by the parties in the light most favorable to the party opposing the motion. *Moore v Cregeur*, 266 Mich App 515, 517; 702 NW2d 648 (2005).

### B. DISTINCT ENTITIES AND MERGER

As a preliminary matter, we note that White Pine in part relies on its contention that the purchase agreement was not between JPMS and the Partnership and, for that reason, cannot constitute evidence of the parties' intent. As already noted earlier, this issue was not properly raised in the trial court, and we decline to consider it. *Walters, supra* at 387-388. Likewise, White Pine again argues with respect to this issue that the purchase agreement should be disregarded because the closing documents contain merger clauses. However, for the same reasons we stated earlier, we reject the contention that the doctrine of merger bars application of the equitable power to reform deeds or otherwise consider prior negotiations and agreements. Therefore, we shall limit our analysis of this issue to whether the trial court properly concluded that, under the undisputed facts of the case, the Partnership was entitled to have the deed reformed to include the restrictions.

### C. THE POWER TO REFORM ON THE BASIS OF MUTUAL AND UNILATERAL MISTAKES

A deed may be reformed because of the mutual mistake of the parties. *Potter, supra* at 407. But the party seeking reformation must prove the mutual mistake by "clear and satisfactory" evidence, "so as to establish the fact beyond cavil." *Crane v Smith*, 243 Mich 447, 450; 220 NW 750 (1928); see also *Stevenson v Aalto*, 333 Mich 582, 589; 53 NW2d 382 (1952) (stating that the burden is on the party seeking reformation and that the evidence "must be convincing and must clearly establish the right to reformation"). A mutual mistake may be one of fact or one of law. See *Schmalzriedt v Titsworth*, 305 Mich 109, 118-119; 9 NW2d 24 (1943). Further, mistakes of law are divided into two classes:

mistakes regarding the legal effect of the contract actually made and mistakes in reducing the instrument to writing. *Id.* at 119-120.

> "In the former, * * * the contract actually entered into will seldom, if ever, be relieved against unless there are other equitable legal features calling for the interposition of the court; but in the second class, where the mistake is not in the contract itself, but terms are used in or omitted from the instrument which give it a legal effect not intended by the parties, and different from the contract actually made, equity will always grant relief unless barred on some other ground, by correcting the mistake so as to produce a conformity of the instrument to the agreement." [*Id.* at 120, quoting 10 RCL at 315.]

A court may also, under certain circumstances, reform a contract on the basis of a unilateral mistake. Michigan has long recognized that an agreement may be reformed because of a unilateral mistake that was induced by fraud. See *Windham v Morris*, 370 Mich 188, 193; 121 NW2d 479 (1963). However, fraud is not a necessary element of every action to reform an agreement on the basis of a unilateral mistake. Our Supreme Court has stated:

> "[I]f one party at the time of the execution of a written instrument knows not only that the writing does not accurately express the intention of the other party as to the terms to be embodied therein, but knows what that intention is, the latter can have the writing reformed so that it will express that intention." [*Woolner v Layne*, 384 Mich 316, 318-319; 181 NW2d 907 (1970), quoting 2 Restatement Contracts, § 505, p 973.]

See also *Barryton State Savings Bank v Durkee*, 325 Mich 138, 140-142; 37 NW2d 892 (1949) (recognizing that a contract may be reformed because of a unilateral mistake where the other party had knowledge of the mistake and concealed that knowledge). Consequently,

although White Pine correctly notes that there was no evidence that JPMS induced the Partnership into making a mistake through fraud, the trial court could reform the deed at issue on the basis of a unilateral mistake without a showing of fraud.

### D. THE EVIDENCE

In support of its contention that the deed at issue should be reformed to include the restrictions provided in the purchase agreement, the Partnership relied on the language of the purchase agreement, Schappacher's deposition, and Jelinek's affidavit. The purchase agreement, which was signed by Schappacher, clearly provides that "[t]he deed to be executed in conveyance of the subject Property shall contain" the specified building and use restrictions. Hence, by signing this agreement, the parties expressly stated that it was their mutual intent that the deed would contain these restrictions. See *Quality Products & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 375; 666 NW2d 251 (2003) ("[A]n unambiguous contractual provision is reflective of the parties' intent as a matter of law.").

Further, Schappacher's deposition testimony confirms that the restrictions were an important part of the negotiations between the parties. Schappacher testified that he participated in negotiations concerning two different parcels of property owned by the Partnership. He stated that JPMS had initially sought a different piece of property than the one eventually purchased. He explained that, after Johnson agreed to modify the building and use restrictions for that first property, Johnson raised the purchase price. Because the new price was "more expensive than what we thought worked for our project," Schappacher began to look at the possibility of purchasing the property at

issue. Schappacher admitted that he was aware of the restrictions contained in the purchase agreement for that property. But he contended that he did not intend them to apply to the property, and that there were continuing discussions even after the signing of the deal. Nevertheless, Schappacher admitted that the continued discussions only concerned approvals and sewer credits that were specifically contemplated under the purchase agreement. He also confirmed that none of these discussions involved waiving or modifying the deed restrictions.

In addition to this testimony, the Partnership submitted Jelinek's affidavit. Although Jelinek carefully avoided taking responsibility for the failure to include the restrictions on the deed, he did aver that the restrictions were "not attached" to the deed "as provided by the Purchase Agreement" and that the affidavit was being made to correct the deed to reflect the parties' actual intent. Hence, he averred that he knew that the deed should have contained the restrictions.

This evidence established the existence of a mutual mistake of law. See *Schmalzriedt, supra* at 120. The Partnership clearly wanted to ensure that the property it sold remained subject to the restrictions. Indeed, the Partnership refused to modify the restrictions on the first property without also raising the price, which in effect ended the first set of negotiations. The fact that Schappacher actually negotiated a change to the first set of restrictions, but only for an increased price, also shows that he was aware of the importance of the restrictions. Hence, these prior negotiations bolster the conclusion that, when Schappacher and Johnson signed the purchase agreement, they had agreed on behalf of their respective entities that the deed should contain the restrictions. And there was no evidence that, there-

after, Schappacher or anyone at JPMS made efforts to remove the restrictions from the deed. Finally, the Jelinek affidavit establishes that the deed did not contain these restrictions even though it was the intent of the parties to have them attached. Thus, this evidence indicates that both parties specifically intended the deed to contain terms that imposed building and use restrictions on the property. Because the terms were omitted from the deed, the deed did not have the legal effect intended by the parties. Hence, the Partnership was entitled to reformation of the deed on the basis of mutual mistake. *Stevenson, supra* at 589.

Notwithstanding this evidence, White Pine argues that the trial court could not find a mutual mistake. White Pine bases this argument on Schappacher's deposition testimony and affidavit to the effect that he did not want the restrictions to apply. However, neither of these submissions establishes that, notwithstanding that inclination, JPMS did not ultimately intend to acquiesce to the restrictions to complete the sale. Further, Schappacher's assertions in this regard are based largely on his account of continuing interactions with Johnson *after* he signed the purchase agreement. However, Schappacher admitted that these subsequent discussions did not involve the restrictions, but were instead entirely related to requirements contemplated by the purchase agreement. Hence, Schappacher's self-serving statements are belied by his own testimony, and they do not establish a question of fact regarding the mutuality of the mistake.

Schappacher's affidavit not only fails to refute the mutuality of the mistake, it actually bolsters the conclusion that Schappacher fully expected the deed to be subject to the restrictions in the purchase agreement. In his affidavit, Schappacher averred that there were a

number of matters "that needed to be resolved prior to the closing." These matters included JPMS's "concerns with the restrictions set forth in the Preliminary Sales Agreement." According to Schappacher, the attorneys wanted to "clarify some of the language before closing." This is clear evidence that Schappacher was aware of the restrictions and believed that the deed would contain the restrictions. In fact, these averments support an inference that Schappacher still expected the restrictions to apply, albeit hopefully with some clarification.

Notwithstanding this, Schappacher further averred:

> All of these considerations, concerns and contingencies [were] considered in totality just prior to closing. All matters relating to title, including the review of the title insurance and the warranty deed was delegated to legal counsel. The closing documents, including the warranty deed, were approved by legal counsel with notice and understanding that the use restrictions were not contained therein. There was no mistake or misunderstanding on the part of JPMS.

On the surface this appears to suggest that JPMS intended the deed to be free of the restrictions. However, on closer examination, it does not establish a question of fact concerning the mutuality of the mistake.

Schappacher averred that he empowered his attorneys to deal with "[a]ll matters relating to title," but at no point did he say that he told his attorneys to refuse to close the deal without first renegotiating the restrictions. In addition, Schappacher did not aver that he or his attorneys actually expressed any concern to the Partnership or otherwise initiated any discussions about the restrictions. Indeed, it is undisputed that the parties did not even attend the closing. Hence, the affidavit does not support an inference that JPMS no longer expected the deed to include the restrictions.

Likewise, Schappacher's averment that the final deed was approved "with notice and understanding" that the deed did not contain the restrictions is not the equivalent of stating that JPMS did not intend or expect the deed to contain the restrictions. Rather, taken in context of the earlier averment that his attorneys were concerned about the language of the restrictions even just before the closing, it is clear that JPMS fully expected the deed to contain the restrictions. Given the prior negotiations concerning deed restrictions that resulted in a lost opportunity to purchase the first property, JPMS must have been surprised when the title company sent a deed with no restrictions. In that sense, because the deed was not as it was expected to be under the parties' agreement, JPMS knew it was a document that had been mistakenly drafted. And the fact that the attorneys approved the deed with the full understanding that it did not contain the contemplated restrictions does not transform the omission into a unilateral mistake. Consequently, the trial court properly determined that the deed did not reflect the actual intent of either party and, accordingly, should be reformed as a mutual mistake.

Even if we were to conclude that Schappacher's affidavit created a question of fact concerning whether the mistake was mutual, the Partnership would still be entitled to relief under unilateral mistake precedents. Reformation would be warranted if JPMS knew that the Partnership intended the restrictions to be included within the deed, recognized that the deed did not accurately express that intent, and remained silent about the mistake. *Woolner, supra* at 318-319; *Barryton State Savings Bank, supra* at 141-142.

Assuming that Schappacher's affidavit supports an inference that JPMS no longer intended the deed to contain the restrictions, there is no evidence that the

Partnership had any intention of voluntarily relinquishing the restrictions negotiated in the purchase agreement. Indeed, as already noted, Schappacher's affidavit supports the conclusion that JPMS fully expected the Partnership to send a deed that contained the restrictions. Further, Schappacher averred that his attorneys recognized that the deed did not contain the contemplated restrictions and approved it on that basis. Thus, the undisputed evidence supports an inference that JPMS knew that the Partnership intended the deed to contain the restrictions, recognized that the restrictions had been omitted, and remained silent about the mistake. Therefore, even if the mistake were unilateral, the evidence submitted by the parties would still warrant reformation of the deed. *Woolner, supra* at 318-319; *Barryton State Savings Bank, supra* at 141-142.

Finally, we note that White Pine's statement of the question presented for this issue suggests that the trial court could not grant the Partnership relief on the basis of unilateral mistake or fraud because the Partnership failed to plead fraud. However, White Pine did not properly support this argument with analysis or citation of relevant authorities in its brief. Rather, White Pine confined its argument to analyzing whether the record evidence was sufficient to establish grounds for reforming the deed. Therefore, to the extent that White Pine raised this issue, it abandoned it on appeal. *Hamade, supra* at 173. In any event, White Pine does not argue that the trial court could not grant relief on the basis of a unilateral mistake and, as already noted, relief for a unilateral mistake may be granted even in the absence of fraud. Consequently, even if White Pine had not abandoned this argument, it would be without merit.

The trial court properly granted summary disposition with regard to the Partnership's request to reform the deed.

## VII. ADMISSIONS

White Pine next argues that the trial court erred when it failed to apply the Partnership's admission that the cell tower did not constitute utility wires or conduits within the meaning of the restrictions.

### A. STANDARD OF REVIEW

The interpretation and application of a court rule involves a question of law that this Court reviews de novo. *Associated Builders & Contractors v Dep't of Consumer & Industry Services Director*, 472 Mich 117, 123-124; 693 NW2d 374 (2005). However, this Court reviews the factual findings underlying a trial court's application of a court rule for clear error. MCR 2.613(C). A finding is clearly erroneous when this Court is left with a definite and firm conviction that a mistake has been made. *Massey v Mandell*, 462 Mich 375, 379; 614 NW2d 70 (2000).

### B. ANALYSIS

On October 19, 2006, White Pine allegedly served requests for admissions on the Partnership. These included requests for the Partnership to admit that the cell tower did not constitute a "utility wire" or "conduit." The Partnership purportedly failed to respond to the requests and, in its motion for summary disposition, White Pine asked the trial court to deem these requests admitted. But the Partnership responded by arguing and presenting evidence that it was never served with requests for admissions. White Pine countered with its own evidence that it had in fact served the requests on the Partnership. In its opinion and order granting summary disposition in favor of the Partnership, the trial court found that the Partnership had not been

served with the requests for admissions: "The Court is persuaded from the Affidavit of Attorney [Mark] Hullman [plaintiff's attorney] and supporting exhibits that the Requests to Admit were not received." For that reason, the trial court did not deem the requested admissions as having been made.

Under MCR 2.312(B)(1), a party served with requests for admission must answer the requests within 28 days. If the party served does not answer within the specified time, the requested admissions are deemed as having been made. *Id.* But as a threshold matter, the requests must actually be served before a party can be faulted for failing to respond. Hence, the trial court had to determine whether the Partnership actually received the requests. On the basis of a credibility assessment of the evidence submitted by the Partnership, the trial court found that the Partnership had not received the requests.

On appeal, White Pine presents the same evidence that it submitted to the trial court in support of its contention that it did in fact serve the requests. But this is insufficient to demonstrate clear error. The dispute over the admissions came down to a credibility assessment of the parties' submissions, including the Partnership's attorney's affidavit. And the trial court resolved this credibility assessment in favor of the Partnership. Although the trial court's credibility assessment was based primarily on written submissions, the trial court's familiarity with the proceedings and the parties' counsel gave it a superior insight into the validity of the competing claims. Because the evidence does not clearly favor either party, we shall defer to the trial court's superior ability to judge the credibility of the parties' attorneys. *Sparling Plastic Industries, Inc v Sparling,*

229 Mich App 704, 716; 583 NW2d 232 (1998). There was no error warranting relief.

VIII. APPLICATION OF THE RESTRICTIONS

White Pine and JPMS also argue that the trial court erred when it interpreted the restrictions to preclude the construction of a cell tower on the property at issue.[1]

A. STANDARD OF REVIEW

The interpretation of restrictive covenants is a question of law that this Court reviews de novo. *Terrien v Zwit*, 467 Mich 56, 60-61; 648 NW2d 602 (2002). In construing restrictive covenants, the overriding goal is to ascertain the intent of the parties. *Tabern v Gates*, 231 Mich 581, 583; 204 NW 698 (1925). Where the restrictions are unambiguous, they must be enforced as written. *Hill v Rabinowitch*, 210 Mich 220, 224; 177 NW 719 (1920). However, restrictions are strictly construed against the would-be enforcer and doubts are resolved in favor of the free use of property. *Stuart v Chawney*, 454 Mich 200, 210; 560 NW2d 336 (1997).

B. UTILITY WIRES AND CONDUITS

The first restriction at issue states, in relevant part, that "[n]o power, telephone or other utility wires or conduits shall be installed above ground on the property

---

[1] We note that White Pine also argues as part of this issue that the restrictions have expired. However, this argument is premised on White Pine's contention that the purchase agreement was between the Trust and JPMS, and not between the Partnership and JPMS. As already noted, because White Pine failed to properly preserve this issue, it has been waived. For this reason, we will only address whether a cell tower constitutes "other utility wires or conduits" within the meaning of the restrictions.

other than the currently existing power lines." The cell tower at issue is clearly a structure installed above ground. Hence, the only question is whether the cell tower constitutes "power, telephone or other utility wires or conduits . . . ."

On appeal, both White Pine and JPMS argue that the cell tower does not constitute "wires" or "conduits" within the meaning of the restrictions. In addition, White Pine argues that, because the cell tower is not available for use by the public, it cannot be a "utility."

A "utility" is commonly understood to be "a public service, as the providing of electricity, gas, water, a telephone system, or bus and railroad lines." *Random House Webster's College Dictionary* (1997). Because the word utility in the agreement modifies "wires or conduits," the restriction only applies to wires and conduits that relate to the provision of public services, such as electricity, gas, water, and a telephone system. It is undisputed that the cell tower is being used as part of a telephone system. Furthermore, the restriction also applies expressly to "telephone . . . wires or conduits . . . ." Because this restriction is not ambiguous, it must be enforced as written. *Hill, supra* at 224.

Nevertheless, it is not clear that the cell tower constitutes "wires or conduits . . . ." The Partnership submitted photos of the cell tower, which do not readily exhibit any wiring. However, a "conduit" is commonly understood to mean "a pipe, tube, or natural channel for conveying water or other fluid," "a channel through which anything is conveyed," and "a structure containing ducts for electrical conductors or cables." *Random House Webster's College Dictionary* (1997). It would seem that the cell tower must contain some cables that are necessary for the transmission of telephone signals. And, if it does have such cables within it, they would

constitute either "conduit" or "wire" within the plain and ordinary meaning of the restriction. However, there is no record evidence to establish the existence of wiring or cable within the cell tower. For that reason, we conclude that the trial court prematurely determined that the cell tower violated the restriction.

### C. UNNATURAL IMPROVEMENT

On appeal, the Partnership argues that the trial court did not err when it determined that the cell tower was a utility conduit, but also argues that the cell tower is an unnatural improvement within the meaning of the restriction labeled "(k)." This restriction provides: "No statue, fence or other unnatural improvements shall be permitted on the Property without the approval of his [sic] Seller or successor." The trial court determined that the fence surrounding the cell tower was prohibited, and neither White Pine nor JPMS contends that the fence would not be barred under the restriction. However, the trial court did not determine whether the cell tower constituted an unnatural improvement.

An "improvement" in the context of real property is defined as "a change or addition by which a thing is improved," and "unnatural" is defined to be something that is "at variance with what is normal or to be expected." *Random House Webster's College Dictionary* (1997). Hence, an unnatural improvement to property would be any improvement that was at variance with what is normal or to be expected. Although this understanding could be construed broadly, the reference to "statue" and "fence" may limit the application of this restriction. See *Griffith v State Farm Mut Automobile Ins Co*, 472 Mich 521, 533; 697 NW2d 895 (2005). Rather than making this determination on appeal and especially in consideration of the fact that it may be

unnecessary if the trial court concludes that the cell tower is prohibited by the restriction against utility "wires or conduits," we conclude that this matter should be determined in the first instance, if necessary, by the trial court.

### D. CONCLUSION

The trial court properly determined that the fence surrounding the cell tower violated the restrictions. However, although the cell tower may constitute "wires or conduits," there is insufficient record evidence to establish this fact. Further, if that fact is not established, a determination must be made whether the cell tower is an "unnatural improvement . . . ." Therefore, on these limited bases, we reverse the trial court's grant of summary disposition and remand for further proceedings.

### IX. RECORDING STATUTES AND EQUITABLE DEFENSES

White Pine next argues that it should be treated as a bona fide purchaser for value without notice of the restrictions and, therefore, protected under the recording statutes. White Pine also argues that it would be inequitable to apply the restrictions to White Pine under the facts of this case.

Under Michigan's recording statutes, all subsequent owners or encumbrances take subject to recorded liens, rights, or interests. MCL 565.25(4). It is undisputed that the deed at issue did not contain any restrictions. Because the restrictions were not recorded, they would be void against a subsequent purchaser in good faith for valuable consideration. MCL 565.29. Hence, if White Pine were a purchaser in good faith for valuable consideration, it would not be subject to the restrictions.

A good faith purchaser is one who purchases without notice of a defect in the vendor's title. *Richards v Tibaldi*, 272 Mich App 522, 539; 726 NW2d 770 (2006). Notice can be actual or constructive. *Id.* In the present case, White Pine entered into an agreement with JPMS concerning the lease of a portion of the property at issue before it had any notice—actual or constructive— regarding the use restrictions. However, although the agreement contained all the provisions of a valid lease, it was initially only an *option* to lease. In order to exercise the option and commence the lease, White Pine had to pay JPMS $550.

A lease can constitute an interest in real property. See MCL 565.35. However, an option to lease is not such an interest. This Court has held that an option to purchase land is "a preliminary contract for the privilege of purchase and not itself a contract of purchase." *Oshtemo Twp v City of Kalamazoo*, 77 Mich App 33, 37; 257 NW2d 260 (1977). Because an option is essentially an offer that requires strict compliance, it does not create an interest in land until the conditions of the offer are met. *Id.* at 37-38. Similarly, an option to lease does not transfer an interest in land until the option is exercised. Because it is undisputed that White Pine had actual notice of the Partnership's claim that the property was subject to the restrictions before it exercised its option to lease, it was not a purchaser in good faith without notice of a defect in the title. *Richards, supra* at 539.

Courts in Michigan will also refrain from reforming deeds where " 'the rights of third parties intervene.' " *Scott, supra* at 239 (citation omitted). And courts may consider the negligence of the party seeking reformation. See *McGinn v Tobey*, 62 Mich 252; 28 NW 818

(1886). However, under the facts of this case, the equities do not weigh against enforcing the restrictions against White Pine.

The Partnership's failure to ensure that the deed contained the restrictions is not the type of negligence that would ordinarily prevent reformation of a deed. See *Urick, supra* at 174. Further, the undisputed facts of this case demonstrate that White Pine became aware of the Partnership's claims before it had exercised its option to lease. Although White Pine likely expended funds to investigate the site, perform due diligence, and initiate the permit process, because it had not exercised the option to lease and had not begun to erect the cell tower, it clearly had the ability to limit its losses. Despite full knowledge of the issues raised by the Partnership, White Pine deliberately proceeded with its plans; it should not now be heard to complain about the result.

## X. LACHES

Finally, JPMS argues that the trial court should have concluded that the doctrine of laches precluded reformation of the deed.

The doctrine of laches is a tool of equity that remedies the inconvenience resulting from a party's failure to assert a right that was practicable to assert. *Dep't of Pub Health v Rivergate Manor*, 452 Mich 495, 507; 550 NW2d 515 (1996). This tool is applicable in cases "in which there is an unexcused or unexplained delay in commencing an action and a corresponding change of material condition that results in prejudice to a party." *Id.* In its motion for summary disposition, the Partnership submitted the affidavit of its real estate agent, Lee Bussa. In the affidavit, Bussa averred that he first learned of White Pine's intention to build a cell tower

when White Pine applied for a permit to construct the tower in the spring of 2006. He also stated that it was only shortly thereafter that he learned that the deed did not contain the restrictions provided by the purchase agreement. Hence, considering these undisputed facts, the Partnership acted as soon as practicable. *Id*. Therefore, the doctrine of laches does not bar the reformation of the deed.

### XI. GENERAL CONCLUSION

The trial court did not err when it exercised its equitable power to reform the deed to include the intended restrictions. Likewise, the trial court did not err when it enjoined the erection of fencing and ordered the removal of the existing fence. Those parts of the trial court's order are affirmed. However, the trial court erred when it determined that the cell tower at issue constituted "wires or conduits" without record evidence demonstrating that the cell tower housed telephone wiring or cables. Therefore, we reverse the part of the trial court's order enjoining the construction of a cell tower on the property at issue and ordering the removal of the existing cell tower. We remand for a hearing concerning whether the cell tower constitutes "wires or conduits" within the meaning of the deed restrictions. Further, whether the cell tower constitutes an "unnatural improvement" within the meaning of the restrictions should be considered on remand, if the trial court determines that the cell tower does not constitute prohibited "wires or conduits . . . ."

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.